# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

IN RE:  
                                                                              BK 09-72336

BARRY R. FREDERICK and  
EUNICE E. FREDERICK,

        Debtors.  
                                                         AP 09-70063

TRAVELERS CASUALTY AND  
SURETY COMPANY OF AMERICA,

        Plaintiff

VS

BARRY R. FREDERICK and  
EUNICE E. FREDERICK,

       Defendants.

## MEMORANDUM OPINION

This adversary proceeding came before this court on November 9, 2011 for trial on Travelers Casualty and Surety Company of America's ("Plaintiff") Complaint to Determine Dischargeability of Indebtedness under 11 U.S.C. § 523(a)(4). Jeffery A. Mobley appeared on behalf of Plaintiff; J. Tony Glenn appeared on behalf of Barry R. Frederick ("Debtor") and Eunice E. Frederick ("Debtor's wife") (collectively, "Debtors"). After reviewing the evidence admitted at trial and the arguments of the parties this court **GRANTS** the requested relief as to Barry R. Frederick and **DENIES** the requested relief as to Eunice E. Frederick.

## JURISDICTION

The district court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 1334(a)

& (b). Jurisdiction is referred to the bankruptcy courts by the General Order of Reference of the United States District Court for the Northern District of Alabama, signed July 16, 1984, as Amended July 17, 1984 pursuant to 28 U.S.C. § 157(a). The bankruptcy court may enter an appropriate order and judgment pursuant to 28 U.S.C. § 157(b)(2)(I).

## FINDINGS OF FACT

Debtors filed a voluntary bankruptcy petition pursuant to Chapter 7 of the United States Bankruptcy Code on September 8, 2009. (Bk. Doc. 1). On December 17, 2009, Plaintiff, a Connecticut corporation engaged in the general insurance and surety business in Alabama, commenced this adversary proceeding by filing the Complaint to Determine Dischargeability of Indebtedness under 11 U.S.C. § 523(a)(4).

Debtor graduated college in 1991 with a degree in engineering and became a registered engineer in 1997. Debtor worked for Big Warrior Corporation as an engineer/project manager for roughly 4 years and then formed his own business, Bulldog Engineering Contractors, Inc. ("Bulldog Engineering") in 2000.[1] Because Bulldog Engineering bid on public construction projects, it was required to obtain a surety bond. Plaintiff agreed to provide Bulldog Engineering with such bond, but required Bulldog Engineering, Debtor, and Debtor's wife to sign a General Agreement of Indemnity ("Indemnity Agreement"). The Indemnity Agreement was signed by Plaintiff, Bulldog Engineering, Debtor, and Debtor's wife on August 15, 2000. The Indemnity Agreement contained the following provision:

9. <u>Trust Fund</u> All payments due, received for or on account of any Contract shall be held in

---

[1] Debtor testified that he formed Bulldog Engineering in 2001. However, this cannot be correct as Bulldog Engineering entered into the General Agreement of Indemnity with Plaintiff on August 15, 2000.

trust as trust funds by Indemnitor for the benefit and payment of all obligations for which the Company as beneficiary may be liable under any Bond issued by the Company. Company may open a trust account or accounts with a bank for the deposit of the trust funds. Upon demand, Indemnitor shall deposit therein all trust funds received. Withdrawals from such trust accounts shall require the express consent of the Company.

(Plaintiff's Exhibit 1).

Bulldog Engineering entered into a contract with Harvest-Monrovia Water and Fire Protection Authority for the construction of Water Main Improvements and Related Appurtenances SRF Project No. SF 010048-01 ("Harvest-Monrovia Project"). (Plaintiff's Exhibit 7). Pursuant to the requirements of that contract, Bulldog Engineering obtained a $2,637,804.00 performance bond[2] and a $2,637,804.00 payment bond[3] issued in favor of the Harvest-Monrovia Water and Fire Protection Authority. (Plaintiff's Exhibits 7 & 8). The performance bond and the payment bond became effective January 15, 2001. (Plaintiff's Exhibit 2). Plaintiff acted as surety on both the performance bond and the payment bond. Bulldog Engineering began experiencing problems on the Harvest-Monrovia Project job site. Debtor testified that the Harvest-Monrovia Water and Fire Authority required Bulldog Engineering to dig up and re-lay large amounts of pipe. During this time period, Bulldog Engineering was doing a lot of work on the Harvest-Monrovia Project, but was not receiving any payment for such work. As a result, Bulldog Engineering began to experience financial difficulties. Eventually, Plaintiff took over the financials on the Harvest-Monrovia Project, meaning that Plaintiff paid the materialmen and subcontractors while also receiving the money owed to Bulldog Engineering for work completed. Before Plaintiff took over the financials on the Harvest-

---

[2] A performance bond is a surety bond issued by an insurance company or a bank to guarantee satisfactory completion of a project by a contractor.

[3] A payment bond is a surety bond issued by an insurance company or bank to guarantee that all subcontractors and material suppliers on a project will be paid.

Monrovia Project, Bulldog Engineering received payments totaling $2,664,235.00. (Plaintiff's Exhibit 3). After Plaintiff took over the financials on the Harvest Monrovia Project, Plaintiff paid $242,844.03 to materialmen and subcontractors. (Plaintiff's Exhibit 6). The following is a table detailing the money paid:

| Payee | Indemnity Paid | Dates Services Performed |
| --- | --- | --- |
| Thompson Tractor Co., Inc. | $4,100.00 | Unknown |
| Reynolds Brothers | $1,734.59 | 03/07/01 - 10/18/02 |
| Cowin Equipment Co., Inc. | $15,557.00 | 04/17/02 - 08/02/02 |
| B.G. Scott Contracting, Inc. | $4,722.00 | 10/01/02 - 10/14/02 |
| Alabama Concrete Co., Inc. | $2,896.00 | 04/10/02 - 08/15/02 |
| United States Pipe & Foundry Co., Inc. | $82,851.67 | 02/08/01 - 06/27/02 |
| Summit Pipe & Supply Co., Inc. | $28,327.74 | 07/16/01 - 10/31/02 |
| Garnet Eletric Co., Inc. | $6,384.73 | 03/18/02 - 04/30/02 |
| Gorman-Rupp Company | $18,520.30 | 10/31/01 - 04/22/02 |
| Hughes Supply, Inc. | $53,000.00 | 08/29/01 - 05/29/02 |
| WW Excavating, Inc. | $24,750.00 | 02/21/02 - 02/28/02 |
|  |  |  |
| Total: | $242,844.03 |  |

Plaintiff received a $43,000.00 check from the Harvest-Monrovia Water and Fire Protection Authority, as well as a $52,230.33 check, which Plaintiff then credited against the amount paid to materialmen and subcontractors who worked on the Harvest-Monrovia Project but were not paid by Bulldog Engineering. In addition, Plaintiff also received $2,000.00 in salvage recovery which was also credited against the total amount paid to the materialmen and subcontractors on the Harvest-

Monrovia Project. Plaintiff paid a net amount of $145,613.70, roughly 5% of the total contract. (Plaintiff's Exhibit 6). Debtor does not dispute that Plaintiff was required to pay this amount pursuant to the terms of the payment bond issued by Plaintiff.[4]

Bulldog Engineering entered into a contract with Curry Water Authority for the construction of 12" & 18" Water Distribution Lines and 700 G.P.M. Booster Pumping Station Contract 2001-04 ("Curry Project"). (Plaintiff's Exhibit 15). Pursuant to the requirements of that contract, Bulldog Engineering obtained a $437,051.00 performance bond and a $437,051.00 payment bond issued in favor of the Curry Water Authority. (Plaintiff's Exhibit 15 & 16). The performance bond and the payment bond became effective January 17, 2002. (Plaintiff's Exhibit 2). Plaintiff acted as surety on both the performance bond and the payment bond. When Bulldog Engineering was in financial distress, Plaintiff also had to take over the financials on the Curry Project. Before Plaintiff took over the financials on the Curry Project, Bulldog Engineering received payments totaling $375,886.00. (Plaintiff's Exhibit 3). After Plaintiff took over the financials on the Curry Project, Plaintiff paid $217,283.60 to materialmen and subcontractors. (Plaintiff's Exhibit 14). The following is a table detailing the money paid:

| Payee | Indemnity Paid | Dates Services Performed |
|---|---|---|
| Lane Ready-Mix Concrete | $1,182.88 | 05/01/02 - 07/31/02 |
| L&A Trucking Co., Inc. | $1,480.74 | 03/02/02 - 08/15/02 |
| Henry Oil Co. | $2,964.08 | 05/23/02 - 08/12/02 |
| United States Pipe and Foundry Co., Inc. | $60,189.46 | 05/30/02 - 06/06/02 |

---

[4]Plaintiff did not have to make any payments pursuant to the performance bond: Bulldog Engineering satisfactorily completed all the work on the Harvest-Monrovia Project. (Plaintiff's Exhibit 11).

| Estes Electric, Inc. | $12,118.44 | 09/03/02 - 09/27/02 |
|---|---|---|
| Clay-Greene Inc. | $73,780.00 | 06/28/02 - 10/07/02 |
| Summit Pipe & Supply | $15,568.00 | 03/18/02 - 10/31/02 |
| Summit Pipe & Supply | $50,000.00 | 03/18/02 - 10/31/02 |
| | | |
| Total | $217,283.60 | |

(Plaintiff's Exhibit 17). Plaintiff received a $51,801.37 check from the Curry Water Authority which Plaintiff then credited against the amount paid to materialmen and subcontractors who worked on the Curry Project but were not paid by Bulldog Engineering. (Plaintiff's Exhibit 18). Plaintiff paid a net amount of $165,482.23, roughly 38% of the total contract. (Plaintiff's Exhibit 14). Debtor does not dispute that Plaintiff was required to pay this amount pursuant to the terms of the payment bond issued by Plaintiff.[5]

Bulldog Engineering entered into a contract with Fayette County Water Authority for the construction of County Road 21 Expansion ("Fayette Project"). (Plaintiff's Exhibit 20). Pursuant to the terms of that contract, Bulldog Engineering obtained a $231,120.00 performance bond and a $231,120.00 payment bond issued in favor of the Fayette County Water Authority. (Plaintiff's Exhibit 20 & 21). The performance bond and the payment bond became effective February 5, 2002. (Plaintiff's Exhibit 2). Plaintiff acted as surety on both the performance bond and the payment bond. When Bulldog Engineering was in financial distress, Plaintiff also had to take over the financials on the Fayette Project. Before Plaintiff took over the financials on the Fayette Project, Bulldog Engineering received payments totaling $179,008.00. (Plaintiff's Exhibit 3). After Plaintiff took over

---

[5]Plaintiff did not have to make any payments pursuant to the performance bond.

6

the financials on the Fayette Project, Plaintiff paid $89,690.51 to materialmen and subcontractors The following is a table detailing the money paid:

| Payee | Indemnity Paid | Date Services Performed |
|---|---|---|
| Summit Pipe & Supply | $38,846.01 | 05/31/02 - 10/31/02 |
| Summit Pipe & Supply | $50,000.00 | 05/31/02 - 10/31/02 |
| Fayette Sand & Gravel, Inc. | $844.50 | 10/09/02 - 10/22/03 |
| | | |
| Total: | $89,690.51 | |

(Plaintiff's Exhibits 19 & 23). Plaintiff received a $12,665.51 check from the Fayette County Water Authority which Plaintiff then credited against the amount paid to materialmen and subcontractors who worked on the Fayette Project but were not paid by Bulldog Engineering. (Plaintiff's Exhibit 24). Plaintiff paid a net amount of $77,025.00, roughly 33% of the total contract. (Plaintiff's Exhibit 19). Debtor does not dispute that Plaintiff was required to pay this amount pursuant to the terms of the payment bond issued by Plaintiff.[6]

Bulldog Engineering entered into a contract with the City of Winfield and the Water Works and Sewer Board of the City of Winfield for the construction of "Water and Sewer to Corridor X, Project No. 271, Section 1, Water Pumping Stations, Water Lines, Sewage Pumping Stations, and Sewer Lines" ("Winfield Project"). (Plaintiff's Exhibit 26). Pursuant to the terms of that contract, Bulldog Engineering obtained a $707,720.00 performance bond and a $707,720.00 payment bond issued in favor of the City of Winfield and the Water Works and Sewer Board of the City of Winfield. (Plaintiff's Exhibit 26 & 27). The performance bond and the payment bond became effective August

---

[6]Plaintiff did not have to make any payments pursuant to the performance bond).

7

28, 2001. (Plaintiff's Exhibit 2). Plaintiff acted as surety on both the performance bond and the payment bond. When Bulldog Engineering was in financial distress, Plaintiff also had to take over the financials on the Winfield Project. Before Plaintiff took over the financials on the Winfield Project, Bulldog Engineering received payments totaling $625,865.00. (Plaintiff's Exhibit 3). After Plaintiff took over the financials on the Winfield Project, Plaintiff paid $231,190.61 to materialmen and subcontractors. The following is a table detailing the money paid:

| Payee | Indemnity Paid | Date Services Performed |
|---|---|---|
| Flowtronex PSI Ltd. | $3,198.70 | 03/04/02 - 03/04/02 |
| Rogers Group, Inc. | $14,727.11 | 04/08/02 - 06/04/02 |
| Green's Septic Tank Service | $2,700.00 | 08/01/02 - 09/30/02 |
| Winfield Tool & Equipment Rental, Inc. | $5,809.39 | 03/13//01 - 08/12/02 |
| AES Precast Co., Inc. | $13,000.00 | 03/14/02 - 03/14/02 |
| United States Pipe and Foundry Co., Inc. | $5,293.73 | 05/21/02 - 05/28/02 |
| Jim House & Associates, Inc. | $152,844.00 | 04/19/02 - 08/05/02 |
| Summit Pipe & Supply | $33,617.68 | 08/31/02 - 10/31/02 |
| | | |
| Total | $231,190.61 | |

(Plaintiff's Exhibits 25 & 28). Plaintiff received a $78,191.65 check from the City of Winfield and the Water Works and Sewer Board of the City of Winfield which Plaintiff then credited against the amount paid to materialmen and subcontractors who worked on the Winfield Project but were not paid by Bulldog Engineering. (Plaintiff's Exhibit 29). Plaintiff paid a net amount of $152,998.96, roughly 22% of the total contract. (Plaintiff's Exhibit 25). Debtor does not dispute that Plaintiff was

required to pay this amount pursuant to the terms of the payment bond issued by Plaintiff.[7]

Bulldog Engineering entered into a contract with the Town of Mulga for the construction of "Water Distribution System Improvements" ("Mulga Project"). (Plaintiff's Exhibit 31). Pursuant to the requirements of that contract, Bulldog Engineering obtained a $642,065.00 performance bond and a $642,065.00 payment bond issued in favor of the Town of Mulga. (Plaintiff's Exhibit 31 & 32). The performance bond and the payment bond became effective December 6, 2001. (Plaintiff's Exhibit 2). Plaintiff acted as surety on both the performance bond and the payment bond. When Bulldog Engineering was in financial distress, Plaintiff also had to take over the financials on the Mulga Project. Before Plaintiff took over the financials on the Mulga Project, Bulldog Engineering received payments totaling $611,778.00. (Plaintiff's Exhibit 3). After Plaintiff took over the financials on the Mulga Project, Plaintiff paid $165,193.93 to materialmen and subcontractors. The following is a table detailing the money paid by Plaintiff for the Mulga Project.

| Payee | Indemnity Paid | Dates Services Performed |
|---|---|---|
| Thomas Utility Construction | $30,600.00 | 03/22/02 - 10/21/02 |
| B.G. Scott Contracting | $9,400.00 | 09/19/02 |
| Vann's Paving Co., Inc. | $3,500.00 | 01/09/03 - 01/14/03 |
| Jefferson County Road & | $2,183.56 | Unknown |
| L & A Trucking Co., Inc. | $9,510.37 | 06/15/02 - 09/05/02 |
| Consolidated Pipe & Supply Co., Inc. | $110,000.00 | 01/18/02 - 10/17/02 |
|  |  |  |
| Total: | $165,193.93 |  |

---

[7]Plaintiff did not have to make any payments pursuant to the performance bond.

(Plaintiff's Exhibit 30). Plaintiff received a $14,781.19 check from the Town of Mulga which Plaintiff then credited against the amount paid to materialmen and subcontractors who worked on the Mulga Project but were not paid by Bulldog Engineering. (Plaintiff's Exhibit 33). Plaintiff paid a net amount of $150,412.74, roughly 23% of the total contract. (Plaintiff's Exhibit 30). Debtor does not dispute that Plaintiff was required to pay this amount pursuant to the terms of the payment bond issued by Plaintiff.[8]

After all of the payment and performance bonds issued to Bulldog Engineering were satisfied, Plaintiff sued the Debtors in the Circuit Court for Marion County, Alabama to recover the money paid out pursuant to the payment bonds. Plaintiff was able to sue Debtors because Debtors signed the Indemnity Agreement agreeing to indemnify Plaintiff for any financial loss suffered as a result of the bonds issued to Bulldog Engineering. On July 31, 2009, in the Circuit Court for Marion County, Alabama, Plaintiff obtained summary judgment against the Debtors in the amount of $779,665.36, plus pre-judgment interest at the legal rate from October 10, 2002. (Plaintiff's Exhibit 4). It is this debt that Plaintiff asserts is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

## CONCLUSIONS OF LAW

Plaintiff asserts that the debt of $799,665.36, plus interest and attorney fees, owed to Plaintiff by Debtors, is nondischargeable pursuant to 11 U.S.C. § 523(a)(4). Section 523(a)(4) provides, in pertinent part:

> (a) A discharge under section 727 . . . . of this title does not discharge an individual debtor from any debt-
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

---

[8] Plaintiff did not have to make any payments pursuant to the performance bond.

Case 09-70063-CMS    Doc 25    Filed 02/13/12    Entered 02/13/12 13:52:30    Desc Main
Document    Page 10 of 20

11 U.S.C. 523(a)(4).

Plaintiff asserts that Debtors committed a defalcation while acting in a fiduciary capacity; therefore, the other circumstances detailed in § 523(a)(4) are not applicable. In order to prove that Debtors committed defalcation while acting in a fiduciary capacity, Plaintiff must show by a preponderance of the evidence that: (1) a fiduciary relationship existed between Plaintiff and Debtors, (2) Debtors committed defalcation in the course of that fiduciary relationship; and (3) such defalcation resulted in a debt.

Because the term defalcation is qualified by the phrase "while acting in a fiduciary capacity," this court will first consider whether Debtors were acting in a fiduciary capacity. Discount Home Center, Inc. v. Turner (In re Turner), 134 B.R. 646, 648 (Bankr. N.D. Ok. 1991) ("There is no need to consider whether debtor has committed 'fraud or defalcation' unless it is first determined that debtor was 'acting in a fiduciary capacity.'").

> The Supreme Court has consistently held that the term "fiduciary" is not to be construed expansively, but instead is intended to refer to "technical" trusts. Unfortunately, the Supreme Court . . . [has left] the lower courts to struggle with the concept of "technical" trusts.
>
> In nineteenth century jurisprudence, the concept of "trust" generally fell into two categories: (1) a voluntary trust, created by contract, often referred to as an "express" trust, and (2) a trust created by operation of law, such as a constructive trust or resulting trust, which generally served as a remedy for some dereliction of duty in a confidential relationship, regardless of the intention of the parties. In the early judicial interpretation of the predecessors to § 523(a)(4), the courts seemed to include the voluntary, "express" trust within the scope of "fiduciary capacity," while excluding the involuntary resulting or constructive trust from the scope of the exception.

Quaif v. Johnson, 4 F. 3d 950, 953 (11th Cir. 1993) (citations omitted). Therefore, if an express trust existed between Debtors and Plaintiff, Debtors were acting in a fiduciary capacity. Whether an express trust existed is determined by looking to relevant state law, in this case Alabama law.

11

Cumberland Surety Ins. Co., Inc., The Mountbatten Surety Co. v. Smith ( In re Smith), 238 B.R. 664, 670 (Bankr. W.D. Ky. 1999). The Supreme Court of Alabama "has held consistently that no particular form of words is required to create a trust, but that any instrument in writing signed by the parties, or party, at the time of the trust's creation, or subsequently, will suffice, if the nature, subject matter, and objects of the trust [are] manifested with reasonable certainty by the instrument." Jones v. Ellis, 551 So. 2d 396, 399 (Ala. 1989). The Indemnity Agreement contained the following trust provision:

> 9. Trust Fund All payments due, received for or on account of any Contract shall be held in trust as trust funds by Indemnitor for the benefit and payment of all obligations for which the Company as beneficiary may be liable under any Bond issued by the Company. Company may open a trust account or accounts with a bank for the deposit of the trust funds. Upon demand, Indemnitor shall deposit therein all trust funds received. Withdrawals from such trust accounts shall require the express consent of the Company.

(Plaintiff's Exhibit 1). The language of the trust provision established an intent to create a trust - the provision provides that all payments "shall be held in trust"; established a trust corpus - all payments due, received for or on account of any contracts covered by bonds issued by Plaintiff; and designated a beneficiary - Plaintiff. Therefore, this court finds that the trust provision contained in the Indemnity Agreement created an express trust pursuant to Alabama law. Because the trust provision in the Indemnity Agreement created an express trust pursuant to Alabama law, this court additionally finds that the trust provision in the Indemnity Agreement created a fiduciary relationship between Debtors and Plaintiff. Because the trust provision in the Indemnity Agreement created a fiduciary relationship between Debtors and Plaintiff, Debtors were acting in a fiduciary capacity when money was received pursuant to such trust provision. As such, Plaintiff proved by a preponderance of the evidence the first element of a nondischargeability cause of action brought pursuant to § 523(a)(4).

12

Because Plaintiff proved that Debtors were acting in a fiduciary capacity, the court must next consider whether Debtors committed a defalcation.

> "Defalcation" refers to a failure to produce funds entrusted to a fiduciary. However, the precise meaning of "defalcation" for purposes of § 523(a)(4) has never been entirely clear. An early, and perhaps the best, analysis of this question is that of Judge Learned Hand in Central Hanover Bank & Trust Co. v Herbst, 93 F.2d 510 (2nd Cir. 1937). Judge Hand concluded that while a purely innocent mistake by the fiduciary may be dischargeable, a "defalcation" for purposes of this statute does not have to rise to the level of "fraud," "embezzlement," or even "misappropriation." Some cases have read the term even more broadly, stating that even a purely innocent party can be deemed to have committed a defalcation for purposes of § 523(a)(4).

Quaiff v. Johnson, 4 F. 3d 950, 955 (11th Cir. 1993) (citations omitted). While the precise meaning of defalcation may not be clear, there appears to be a consensus among courts that the use of funds for any purpose other than the purpose for which the funds were entrusted constitutes a defalcation. See, e.g., Safeco Ins. Co. of America v. Hastings (In re Hastings), 438 B.R. 743, 745 (Bankr. N.D. Ala. 2008) (finding that any use of bond funds to pay expenses for which the surety was not liable constituted a defalcation for purposes of § 523(a)(4)); Int'l Fidelity Ins. Co. v. Fox (In re Fox), 357 B.R. 770, 779 (Bankr. E.D. Ark. 2006) ("'It is the mere act of using the trust fund for any purpose other than the purpose for which the trust was created that constitutes misuse or misappropriation of the trust fund which is a defalcation committed by the fiduciary.'") (quoting Baugh v. Matheson (In re Matheson), 10 B.R. 652, 656 (Bankr. N.D. Ala. 1981)). For the reasons that follow, this court finds that Debtor committed a defalcation, but that Debtor's wife did not.

Debtor's wife's involvement in this case arises from her joining with her husband to personally guarantee Bulldog Engineering's obligations by signing the Indemnity Agreement; she was not a shareholder, officer, or director of Bulldog Engineering, nor was she involved in its day-to-day operations. In short, it appears clear that she did not have access to or control over the funds entrusted

13

to Bulldog Engineering. Thus, the court finds it would have been impossible for her to commit a defalcation with respect to those funds. In re Smith, 238 B.R. at 674.

Debtor was the principal of Bulldog Engineering and the evidence shows that Debtor handled the financials of Bulldog Engineering. Debtor testified about how payments were made to the subcontractors and materialmen who worked on the various projects at issue in this case. In addition, Debtor filled out and signed all of the payment estimates submitted by Bulldog Engineering. (Plaintiff's Exhibits 9, 17, 22, 29, & 34).[9] Therefore, this court finds that Debtor was in charge of the funds entrusted to Bulldog Engineering by Plaintiff. Plaintiff has shown that Debtor, acting on behalf of Bulldog Engineering, received $4,456,772.00 pursuant to the terms of the payment bonds at issue in this case.[10] Plaintiff has also shown that Debtor was acting in a fiduciary capacity when he received those funds on behalf of Bulldog Engineering. The burden now shifts to Debtor to account fully for all funds received by him in his fiduciary capacity. Otto v. Niles (In re Niles), 106 F. 3d 1456, 1462 (9th Cir. 1997). See also Armendariz v. Galvan (In re Galvan), 430 B.R. 685, 690 (Bankr. D. N.M. 2009) ("Plaintiffs must establish that a fiduciary relationship between themselves and Defendant existed, that funds or property were entrusted to the Defendant, and that Defendant committed fraud or defalcation in the course of that fiduciary relationship. Once that proof is made, the burden shifts to the debtor-fiduciary to account for the entrusted funds."); Capitol Indemnity Corp.

---

[9]In every project at issue in this adversary proceeding, Debtor filled out at least one Payment Estimate, in which Debtor requested payment for the work completed. Each Payment Estimate contained various contractor certifications wherein Debtor certified that all previous subcontractors, materialmen, and laborers were paid from proceeds received pursuant to previous Payment Estimates. These certifications were clearly false.

[10]Bulldog Engineering received $2,664,235.00 on the Harvest Monrovia Project, $375,886.00 on the Curry Project, $179,008.00 on the Fayette Project, $625,865.00 on the Winfield Project, and $611,778.00 on the Mulga Project. (Plaintiff's Exhibit 3).

14

v. Miulli (In re Miulli), No. 98-2024, 1999 WL 33593711, at *3 (Bankr. S.D. Fla. April 13, 1999).
No such accounting has been provided by the Debtor. There is some evidence as to how the money entrusted to Debtor was spent, but such evidence was provided by Plaintiff. Plaintiff's exhibits contain forms filled out by some of the materialmen and subcontractors who were seeking payment from Plaintiff. In some of these forms, the claimants indicated how much they had been paid and how much they were still owed. A detailed analysis of Plaintiff's Exhibits follows.

Plaintiff's Exhibits 3 and 10 show that Debtor received $2,664,235.00 for work done on the Harvest Monrovia Project and that Debtor paid materialmen and subcontractors $1,365,219.02. At least three materialmen and subcontractors were paid nothing on this project and ultimately Plaintiff had to pay $145,613.70 to materialmen and subcontractors who worked on the Harvest Monrovia Project. This court has no evidence that shows what happened to the rest of the money received by Debtor.

Plaintiff's Exhibits 3 and 17 show that Debtor received $375,886.00 for work done on the Curry Project and that Debtor paid materialmen and subcontractors $84,201.55. At least one materialman and/or subcontractor was paid nothing on this project and ultimately Plaintiff had to pay $165,482.23 to materialmen and subcontractors who worked on the Curry Project. The court has no evidence that shows what happened to the rest of the money received by the Debtor on the Curry Project.

Plaintiff's Exhibits 3 and 23 show that Debtor received $179,008.00 on the Fayette Project and that Debtor paid materialmen and subcontractors $27,264.35. Ultimately, Plaintiff had to pay $77,025.00 to materialmen and subcontractors who worked on the Fayette Project. The court has no evidence that shows what happened to the rest of the money received by the Debtor on the Fayette

Case 09-70063-CMS    Doc 25    Filed 02/13/12    Entered 02/13/12 13:52:30    Desc Main
Document    Page 15 of 20

Project.

Plaintiff's Exhibits 3 and 28 show that Debtor received $625,865.00 on the Winfield Project and that Debtor paid materialmen and subcontractors $120,483.27. At least one materialman and/or subcontractor was paid nothing on the project and ultimately Plaintiff had to pay $152,998.96 to materialmen and subcontractors who worked on the Winfield Project. The court has no evidence that shows what happened to the rest of the money received by the Debtor on the Winfield Project.

Plaintiff's Exhibits 3 and 33 show that Debtor received $611,778.00 on the Mulga Project and that Debtor paid materialmen and subcontractors $267,440.50. At least one materialmen and/or subcontractor was paid nothing on the project and ultimately Plaintiff had to pay $150,412.74 to materialmen and subcontractors who worked on the Mulga Project. The court has no evidence that shows what happened to the rest of the money received by the Debtor on the Mulga Project.

In summation, this court has evidence that $4,456,772.00 in trust funds were paid to Debtor, evidence that $1,864,608.69 of those trust funds were used to pay materialmen and subcontractors, and evidence that $691,532.63 was owed to materialmen and subcontractors after the contract prices was paid in full.[11] That leaves $2,592,163.31 of trust funds that are unaccounted for by Debtor.

Although Debtor did not provide any accounting of what happened to the trust funds, Debtor did offer two explanations in his testimony. First, Debtor testified that no money from any other project was used on the Harvest-Monrovia Project and that Debtor was using his personal funds to pay the employees of Bulldog Engineering in order to keep work going on the Harvest-Monrovia

---

[11]Plaintiff had to pay the following net amounts on each payment bond: $145,613.70 pursuant to the payment bond issued for the Harvest-Monrovia Project; $165,482.23 pursuant to the payment bond issued for the Curry Project; $77,025.00 pursuant to the payment bond issued for the Fayette Project; $152,998.96 pursuant to the payment bond issued for the Winfield Project; and $150,412.74 pursuant to the payment bond issued for the Mulga Project.

Project.[12] Debtor further testified that he knew this to be true because Bulldog Engineering was not working on any other projects until the Harvest-Monrovia Project was completed. Despite the court's reservations about the accuracy of this statement,[13] even if the Debtor's testimony is correct, it does not explain why obligations owed to materialmen and subcontractors remained unpaid. If Debtor was using his personal funds to pay for the extra, uncompensated work being done, why was Plaintiff required to compensate materialmen and subcontractors who worked on the Harvest Monrovia Project?[14] Second, Debtor asserted that he had no control over how the suppliers applied the payments made by Bulldog Engineering. Specifically, Debtor asserts that U.S. Pipe & Foundry, as

---

[12]It is clear that Bulldog Engineering's financial problems began when large quantities of pipe had to be dug up and re-laid on the Harvest-Monrovia Project. It would logically follow that it was this extra work that caused the large deficiency if money being received for other projects was being used to pay for the uncompensated work being done on the Harvest-Monrovia Project. Debtor testified that this was not the case.

[13]Debtor completed 99.9% of the work on the Harvest Monrovia Project prior to October 21, 2002. Debtor's Final Payment Estimate shows that work was completed on April 30, 2003. It is not clear exactly when Bulldog Engineering had to dig up and relay the pipe on the Harvest-Monrovia Project, so it is not clear whether work was being done on other projects at that time; however, it is clear that Bulldog Engineering was working on other projects while still working on the Harvest-Monrovia Project. The bonds for the Curry Project became effective January 17, 2002 and the Final Payment Estimate shows that work started on March 4, 2002, a time when Bulldog Engineering was still working on the Harvest-Monrovia Project. (Plaintiff's Exhibit 17). The bonds for the Fayette Project became effective February 5, 2002 and the Final Payment Estimate shows that work started on April 22, 2002, a time when Bulldog Engineering was still working on the Harvest-Monrovia Project. (Plaintiff's Exhibit 22). The bonds for the Winfield Project became effective August 28, 2001 and the Final Payment Estimate shows that work began on September 10, 2001, a time when Bulldog Engineering was still working on the Harvest-Monrovia Project. (Plaintiff's Exhibit 29). The bonds for the Mulga Project became effective December 6, 2001 and the Final Payment Estimate shows that work began on January 12, 2002, a time when Bulldog Engineering was still working on the Harvest-Monrovia Project. (Plaintiff's Exhibit 34). Debtor's testimony to the contrary is not credible.

[14]Recall that Plaintiff had to pay a net amount of $145,613.70 pursuant to the payment bond issued on the Harvest Monrovia Project.

17

well as Summit Pipe & Supply, would automatically apply any payment to the oldest invoice, and that was why some of the money from another project could be used to pay for materials for a current project. Again, despite the court's reservations about the accuracy of this statement,[15] even if the Debtor's testimony is correct, it still does not explain how $691,532.63 worth of material and labor remained unpaid; evidence of how payments are applied does not constitute evidence of payments made.

Plaintiff provided evidence that $4,456,772.00 in trust funds were paid to Debtor, evidence that $1,864,608.69 of those trust funds were used to pay materialmen and subcontractors, and evidence that $691,532.63 was owed to materialmen and subcontractors after the contract prices were paid in full. Debtor did not provide an accounting of the trust funds, nor did Debtor provide a satisfactory explanation as to how $691,532.63 remained unpaid to the materialmen and subcontractors who worked on the projects at issue in this adversary proceeding. In the absence of an accounting or a satisfactory explanation, this court must come to the conclusion that the trust funds were used for purposes other than payment of materialmen and subcontractors. Therefore, Debtor committed a defalcation by failing to use the trust funds for the purpose to which they had been

---

[15] The detailed pay history of Summit Pipe & Supply attached to Plaintiff's Exhibit 28 contradicts Debtor's testimony that Summit Pipe & Supply always applied payments to the oldest invoice first. Specifically, Invoice 11012, due on 10/18/2001, was paid on April 18, 2002 via check number 4662 while Invoice 11185, due on 11/15/2001, was paid on February 28, 2002 via check number 4432. In this case, a newer invoice was paid first. In addition, it appears that US Pipe Foundry knew what invoices were associated with what project as evidenced by the following paragraph contained in Plaintiff's Exhibit 28: "Attached is a revised statement showing three invoices moved from the Harvest-Monrovia Project to a third claim for $5,293.73 for the Winfield Project. This will reduce the claim against Harvest-Monvovia to $82,851.67." This calls into doubt the accuracy of Debtor's testimony.

18

entrusted:[16] the funds were supposed to be held in trust to pay obligations "for which the [Plaintiff] as beneficiary may be liable under any Bond issued by the [Plaintiff]", i.e., to pay obligations owed to materialmen and subcontractors who worked on the bonded projects at issue in this adversary proceeding. By not holding the funds in trust to pay those obligations, Debtor violated the trust provision contained in paragraph 9 of the Indemnity Agreement and committed a defalcation while acting in a fiduciary capacity. Plaintiff proved by a preponderance of the evidence the second element of a nondischargeability cause of action brought pursuant to § 523(a)(4).

Debtor owes Plaintiff $799,665.36 pursuant to the terms of the Indemnity Agreement: Debtor does not dispute the validity of the Indemnity Agreement. Debtor does not dispute that a judgment in the amount of $799,665.36, plus interest, was issued in favor of Plaintiff after Plaintiff was granted summary judgment in the lawsuit Plaintiff commenced against Debtor. In short, Debtor does not dispute that he owes Plaintiff a debt in the amount of $799,665.36 pursuant to the Indemnity Agreement. As such, Plaintiff proved by a preponderance of the evidence the third element of a nondischargeability cause of action brought pursuant to § 523(a)(4). Therefore, the debt owed to Plaintiff in the amount of $799,665.36, plus interest and fees,[17] is nondischargeable pursuant to § 523(a)(4).

## CONCLUSION

Debtor and Debtor's wife were fiduciaries of Plaintiff pursuant to the trust provision contained

---

[16]Recall that a defalcation, as used in the context of Section 523(a)(4) "refers to a failure to produce funds entrusted to a fiduciary." Quaif, 4 F. 3d at 955. The fiduciary's conduct "does not have to rise to the level of 'fraud,' 'embezzlement,' or even 'misappropriation.'" Id.

[17]"Once a debt has been determined nondischargeable, a creditor's attorney's fees, if provided for by contract, are included as part of the nondischargeable debt." Transouth Financial Corp. Of Florida v. Johnson, 931 F. 2d 1505 (11th Cir. 1991).

19

in the Indemnity Agreement. Debtor's wife did not commit a defalcation while acting in a fiduciary capacity because she had no control over any of the funds entrusted to Bulldog Engineering; therefore, it was impossible for Debtor's wife to misuse any of the funds entrusted to Bulldog Engineering. Therefore, the $799,665.36, plus interest and fees, owed by Debtor's wife to Plaintiff pursuant to the terms of the Indemnity Agreement is dischargeable pursuant to 11 U.S.C. § 523(a)(4). Debtor did commit a defalcation while acting in a fiduciary capacity because Debtor had control over the funds entrusted to Bulldog Engineering and those funds were used for a purpose other than the purpose for which the funds were entrusted. Therefore, the $799,665.36, plus interest and fees, owed by Debtor to Plaintiff pursuant to the terms of the Indemnity Agreement is nondischargeable pursuant to § 523(a)(4). As such, this court **GRANTS** the Plaintiff's request to find the debt owed to it by Barry R. Frederick nondischargeable and **DENIES** the Plaintiff's request to find the debt owed to it by Eunice E. Frederick nondischargeable.

**DONE and ORDERED** this February 13, 2012.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge